# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

CAROL DIANE GOWER,

    *Plaintiff,*

*v.*                            CASE NO. 2:13-CV-14511

CAROLYN W. COLVIN          DISTRICT JUDGE ARTHUR J. TARNOW
Commissioner of Social Security,    MAGISTRATE JUDGE PATRICIA T. MORRIS

    *Defendant.*
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for Disability Insurance Benefits ("DIB") under

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 11.)

Plaintiff Carol Diane Gower alleges her disability began when she was fifty-seven years old. (Transcript, Doc. 11 at 138.) Plaintiff worked as a machine operator from 1993 until 2006 and as a receptionist from 2006 until 2011. (Tr. at 163, 196.) On September 6, 2011, Plaintiff filed the present claim for DIB, alleging that she became unable to work on August 18, 2011. (Tr. at 138.)

The claim was denied at the initial administrative stage. (Tr. at 95.) In denying the claim, the Commissioner considered discogenic and degenerative back disorders, and also various arthropathies. (*Id.*) On December 5, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") Patricia McKay, who considered the application for benefits de novo. (Tr. at 30-80.) In her decision issued on January 17, 2013, the ALJ found that Plaintiff was not disabled. (Tr. at 17, 26.) Plaintiff requested a review of this decision on February 9, 2013. (Tr. at 8-9.)

The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on August 29, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-3.) On October 28, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Pl.'s Compl., Doc. 1.)

## B.    Standard of Review

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations to ensure they are supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then

2

to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ

finds contradictions among medical reports, claimant's testimony, and other evidence.")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

### C.     Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-434, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who

have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means

inability

> to engage in any substantial gainful activity by reason of any medically determinable
> physical or mental impairment which can be expected to result in death or which has
> lasted or can be expected to last for a continuous period of not less than [twelve]
> months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity,
> benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of
> impairments that "significantly limits . . . physical or mental ability to do basic work
> activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a
> severe impairment that is expected to last for at least twelve months, and the severe
> impairment meets or equals one of the impairments listed in the regulations, the
> claimant is conclusively presumed to be disabled regardless of age, education or
> work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits
> are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work,
> if other work exists in the national economy that plaintiff can perform, in view of his
> or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes

a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d

at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of

limitations caused by her impairments and the fact that she is precluded from performing her past

relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since the application date. (Tr. at 19.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: "history of cervical degenerative disc disease/disc herniation status post anterior cervical discectomy fusion with allograft and planting and history of lumbar laminectomy." (*Id.*) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at 21.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. at 24-26.) The ALJ also found that Plaintiff was fifty-seven years old on the application date, putting her in the "advanced age" category. (Tr. at 25.) *See* 20 C.F.R. §§ 404.1563, 416.963. At step five, the ALJ found that Plaintiff could perform a limited range of sedentary jobs existing in significant numbers in the regional economy. (Tr. 21-24.)

### E.    Administrative Record

The medical record is meager, spanning less than one-hundred pages filled with duplicates

and barely legible handwritten scrawl. (Tr. at 207-85.) Plaintiff was examined at St. John Hospital by Dr. Laura Fox Smith on September 28, 2010, complaining of left shoulder and arm pain, and also back spasms. (Tr. at 224.) The notes state, without explanation, that she could not lift her arm and Vicodin failed to relieve the pain. (*Id.*) The objective review found heart murmurs and her arm hurt and had limited range of motion. (*Id.*)

Plaintiff went to the emergency room on October 1, 2010, unable to lift her left arm due to shoulder pain. (Tr. at 208.) She rated the pain at level ten out of ten on a visual analog ("VA") scale, and said it had persisted for four days. (Tr. at 210, 212.) She reported a previous, undated back surgery to the examiner. (Tr. at 213.) X-rays showed "moderate degenerative changes" in the lower cervical spine, along with narrowing disc spaces at C5-C6 and C6-C7. (*Id.*)

Cervical spine magnetic resonance imaging ("MRI") was conducted on October 6, 2010. (Tr. at 227, 281.) Dr. Roger Gonda, reviewing the MRI, concluded Plaintiff had degenerative disc disease at multiple levels. (*Id.*) Specifically, there was "mild diffuse disc bulging" at C2-C3; "mild disc bulging" at C3-C4; disc herniation causing moderate flattening and deformity, "severe neural foraminal compromise," and "dorsal displacement of the ventral nerve root sleeve" at C4-C5; disc herniation and spur, and also "bilateral neural foraminal compromise" at C5-C6; and disc herniation and spur, moderate flattening and deformity, and "marked bilateral neural foraminal compromise" at C6-C7. (Tr. at 226, 280.)

Plaintiff saw Dr. Daniel P. Elskens on November 3, 2010, to discuss her cervical spine and shoulder pain. (Tr. at 244.) The pain developed spontaneously two months ago in her lower neck and left shoulder, which were tight and ached, weakening her left arm and reducing her range of motion. (*Id.*) The area also spasmed. (*Id.*) Walking and lifting exacerbated the pain; lying down

8

alleviated it. (*Id.*) The physical assessment found that her head and neck had mild range of motion restriction, normal stability, and normal strength and tone. (Tr. at 245.) Her gait, station, reflexes and posture were normal, and the Romberg test was negative. (*Id.*) An MRI showed moderate kyphotic deformity, degenerative disc disease at C4 through C7, and some compression. (*Id.*) He assessed cervical spondylosis without myelopathy and recommended surgery. (*Id.*)

On November 11, 2010, examination notes state her mobility decreased, her cardiovascular, respiratory, and gastrointestinal systems received an unexplained negative mark, and her skeletal system was abnormal on examination. (Tr. at 223.) The sheet provides no explanation of its findings. Chest x-rays taken the next day revealed no abnormalities. (Tr. at 242, 279.)

At the end of November, Plaintiff underwent an "anterior cervical discectomy, fusion, [and] plating" at the C4 through C7 levels. (Tr. at 238, 240.) Dr. Elskens, the operating surgeon, wrote that her symptoms were "consistent with cervical spondylosis," and an MRI showed kyphosis. (*Id.*) The surgery proceeded without incident. (Tr. at 240-41.) Dr. Elskens examined her one month later, finding that the symptoms diminished: "patient denies neck pain. The patient denies radicular pain. . . . The patient is very satisfied with [the symptoms'] postop course. There is weakness in the left shoulder, [and] the left arm, which is improved." (Tr. at 238.) The physical examination of her head, neck and shoulder girdle showed "[n]o tenderness, crepitation or deformity to palpation. Head and neck in neutral position. Full, painless range of motion of the neck. Normal stability. Normal strength and tone." (*Id.*) Likewise, her gait, station, and posture were normal, and the Romberg test was negative. (*Id.*) Imaging studies of the operation site displayed proper fusion at all cervical levels. (Tr. at 238, 243.)

9

Though difficult to decipher, a report from November 12, 2010 shows mixed results. (Tr. at 276.) The examiner circled the "minus" sign, rather than the "plus" symbol, to represent various areas, including Plaintiff's cardiovascular system, respiratory system, and gastrointestinal system; however, her musculoskeletal system was healthy, receiving a "plus." (*Id.*) However, below that section, the examiner marked that her skeletal system was abnormal. (*Id.*) The only other pertinent information gleaned from the sheet is that Plaintiff used tobacco. (*Id.*)

Plaintiff saw Dr. Lal Banerji, a consultative examiner for the state agency, on November 15, 2011. (Tr. at 252.) Her diabetes began in 2002, but the only current symptoms were nocturia and occasional cramps, resolved "within a few seconds" by standing up. (*Id.*) Her cardiovascular system appeared normal, no chest pains or palpitations; but she asserted she had hypertension. (*Id.*) In 1990, Plaintiff developed lower back pain after "a work-related injury," and she had a laminectomy and discectomy in 1997. (*Id.*) Later, "[h]er condition improved to about 50 percent." (*Id.*) She worked throughout this period and quit only recently, in August 2011, due to her neck surgery. (*Id.*) The back problems persisted, she maintained, and she also had pain and swelling in her ankles. (*Id.*) She estimated she could "walk two to three blocks at street level, stand for thirty minutes, . . . climb one flight of stairs[,] . . . sit for two to three hours[,] and lie on the bed for several hours" tossing and turning. (*Id.*) Occasional dizzy spells occurred, she claimed, but she "never had a fall." (*Id.*)

She then explained the issues with her cervical spine, noting her emergency room visit, surgery, and physical therapy. (*Id.*) "The weakness in her left arm improved," she said. (*Id.*) Curiously, the notes state that she did not have neck pain before the surgery, but now did. (*Id.*) Nonetheless, the pain was mild and did not limit her movement. (*Id.*) Her right shoulder pain

improved after the surgery, and any lingering pain did not radiate down her arm or limit movement. (*Id.*) She could make a fist and her grip was "good" in both hands: she could button, "tie and untie shoelaces, open doors, write legibly, [and] push and pull." (Tr. at 253.) She knew she could lift twenty-two pounds from the ground and carry it twenty feet "with bearable pain" because "[h]er grandchild weighs that much . . . ." (*Id.*) Her neck and back stiffened periodically. (*Id.*) She used various medication, but "stopped using [a] cervical collar . . . ." (*Id.*) She also "suffer[ed] from mental stress," but had never seen a psychiatrist and her memory was "good." (*Id.*)

Dr. Banerji determined that Plaintiff's neck was supple, she could stand without support, her spine was not tender, her lumbar spine hurt when she moved but was not restricted, her straight leg raises were ninety degrees on both sides without pain, and she had normal cervical and lumbar lordosis. (Tr. at 253-54.) He noted that hip and knee movements were somewhat restricted, but painless. (Tr. at 254, 255.) She walked well, could walk on her toes or heels or in tandem with difficulty, and never complained of pain throughout these tests. (*Id.*) She could squat and rise with lower back pain, and she could stand up from a supine position, get on and off the examination table without help, dress, and undress, and her reflexes were normal. (*Id.*) He concluded her fingers had normal dexterity. (*Id.*) Further, despite subjective complaints, "there [was] no significant physical finding or functional limitations noted during [the] examination" except the pain upon squatting and difficulty with specialized walks. (*Id.*) She could work full time if she avoided climbing ladders and scaffolding, prolonged standing, frequent bending, lifting heavy weights, and squatting. (*Id.*)

Plaintiff completed a report on September 25, 2011 describing her daily activities, capacities, and impairments.(Tr. at 170.) Her husband filled out a similar report a few days earlier, mirroring Plaintiff's conclusions. (Tr. at 155.) Plaintiff said she passed the typical day doing light house work, playing computer games, crocheting, and watching television. (Tr. at 170.) Personal care was not a problem, except reaching her head proved difficult if her neck or arm hurt. (Tr. at 171.) Cooking everyday, she sometimes made large meals with help, (Tr. at 172), although her husband implied that her pain prevented finishing complete meals. (Tr. at 157.) Around the house, she wrote, "I do cleaning," which she revised in the margin to read, "I do *light* cleaning." (Tr. at 172.) Included in light cleaning was vacuuming every other day for a half hour to forty-five minutes and doing laundry, "sometimes all day," once per week. (*Id.*) Her husband estimated that she put in three hours of cleaning every other day. (Tr. at 157.) She also planted flowers. (Tr. at 157.) But she did all of this only when she felt able, "if I start to hurt I stop then [sic] go back to it." (*Id.*) Her husband and sister took over many chores. (Tr. at 162.)

She could drive and leave her house without help; she shopped for food and clothing in stores and online. (Tr. at 173.) Managing financial affairs did not present problems, and she asserted being capable of paying bills, counting change, handling her savings account, and using a checkbook. (*Id.*) Friends visited occasionally, and she chatted with them on the phone everyday. (Tr. at 174.) Her pain circumscribed her social activities, but dinners, theater, and visits were possible, she said, "as long as we don't sit to[o] long . . . ." (Tr. at 175.) She asserted limitations in nearly every physical category, except the use of her hands, but only found one mental difficulty, completing tasks. (Tr. at 175.) Nonetheless, she finished projects she started and could maintain her attention unless she was "in pain." (*Id.*)

She also completed a "Pain Questionnaire." (Tr. at 185.) Her neck began hurting in September 2010, her back in 1997. (*Id.*) The pain extended to her arm and sometimes gave her headaches. (*Id.*) Asked how often the pain occurred, she stated, it "all depends on what I [am] doing," but once started it could last for days. (*Id.*) Her medicines provided "some" relief, kicking in anywhere from one-half hour to one hour after taking them. (*Id.*)

On December 19, 2011, Dr. Patricia Madej, a consultative examiner, met with Plaintiff to discuss her mental health. (Tr. at 261-65.) At the start of the session Plaintiff launched into her list of physical impairments. (Tr. at 261.) Told it was a mental health evaluation, she said,

> "I don't know why they sent me to you. It's nothing to do with my mental state. (?) When you're used to working all your life it's very hard when you can't do it anymore. I do get depressed because of my life. I get breakdowns all the time. I passed out a few times. I don't know why. I just go out. My husband's veen very sick. I don't know. I guess it gets overwhelming at times. . . . I'm not mentally ill or anything [. . . ] only stress. Just stress."

(*Id.*) Unsurprisingly, she had no "history of inpatient or outpatient psychiatric treatment." (*Id.*) The report then traces a series of her responses to different aspects of daily functioning. (Tr. at 262.) Her social life seemed to brim with friends and family: "I love people. I have lots of friends. I don't see them that often. . . . [but] [t]hey call me all the time to see how I'm doing." (*Id.*) Her interests and hobbies were more limited but included crocheting, cooking, shopping, watching television, and "'having the grandkids over.'" (*Id.*) She also pitched in on chores, such as cleaning and laundry. (*Id.*)

Dr. Madej found Plaintiff's physical appearance and behavior unremarkable, noting merely that Plaintiff complained of constant neck pain and periodically stretched her neck. (*Id.*) Her motor activity appeared normal as well and though Plaintiff complained that her pain made it so she "'can't just sit,'" Dr. Madej observed that she "sat throughout the interview . . . . " (Tr. at 263.)

Moving to the mental assessment, Dr. Madej determined that Plaintiff's "contact with reality was good," her speech and thought "were well organized and goal directed," her affect was euthymic, and she had appropriate mental orientation, but her insight and judgment were poor. (*Id.*) She was "significantly focused on the symptoms of her pain," and said her mood was "'pissed off.'" (*Id.*) Dr. Madej concluded that Plaintiff was bereaving multiple losses–her physical abilities, employment, and her recently deceased sister–and reported a "Fair" prognosis. (Tr. at 264.) She also assigned a  Global Assessment of Functioning score of sixty to sixty-three. (*Id.*) This score indicates either (1) "[s]ome mild symptoms. . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships," or (2) "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning . . . ." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000).

On the same day as Dr. Madej's consultation, Dr. James P. Cole reviewed the record evidence for the state agency. (Tr. at 93.) Of note, he considered Listing 1.04 before concluding that Plaintiff was not disabled. (Tr. at 90, 94.) This demonstrates that he believed Plaintiff neither met nor equaled the listing.

A blood test on April 13, 2012, showed that Plaintiff had vitamin D deficiency. (Tr. at 270.) Plaintiff was examined the same day by Dr. Smith. (Tr. at 267.) The notes indicate Plaintiff's stress level had risen, she suffered insomnia, and her neck and back hurt. (*Id.*) All of the examination notes, including the skeletal portion, were unchanged. (*Id.*)

At the administrative hearing on December 5, 2012, Plaintiff testified that she lived with her husband, son, and two grandchildren. (Tr. at 35.) At her first job, in a steel company, she

14

"drove a sweeper and actually had to clean . . . up underneath the machines . . . ." (Tr. at 38.) She worked in other positions at the factory as well, generally lifting one to ten pounds, though as the ALJ pointed out, her work history report listed ten to twenty pounds. (Tr. at 39.) Plaintiff confirmed it was the former range. (*Id.*) Her employment ended when the factory closed. (Tr. at 44.) At Lighthouse, her next job, she wrote files and used the computer, frequently lifting less than ten pounds. (Tr. at 42.) She quit working because of her pain, which produced headaches and disrupted her sleep: "I loved the job . . . but I just couldn't do it anymore. I was going in late. It was causing some issues, you know, with not getting there on time because I just couldn't sleep at night." (Tr. at 43-44.)

Plaintiff said she did not know how often she drove each week, stating she got in the car to go to the store and doctors, and to pick up her grandchildren from school. (Tr. at 46-47.) On a typical day, after a fitful night's sleep, she rose early to wake her grandchildren. (Tr. at 48.) Then she would sit, followed by cleaning, followed by more sitting, and sometimes again cleaning, which could take her the entire day. (*Id.*) She did not often cook, read, or use the computer. (Tr. at 49-50.) Her shopping trips were limited to "get[ting] what we really need to have," she said, "and that's about it." (Tr. at 50.) She had not crocheted for a year, she added. (Tr. at 51.)

Her neck bothered her more than her back. (Tr. at 52.) Standing in one position hurt her back, and she mentioned vaguely using a walker with a seat, which she obtained last summer, if she anticipated needing to sit. (Tr. at 52.)  Bending would cause shooting pains in her neck. (*Id.*) Shorter walks were not difficult, but walking around the grocery store while shopping was. (Tr. at 53-54.) Sitting was sometimes tricky, but it helped that she could lie down, move, stand, or walk when she was home. (Tr. at 54.) Dr. Smith provided pain medication and other prescriptions for

15

her mental health issues. (Tr. at 55–56.) She added that her diabetes perhaps explained her blurred vision and her dizziness while working at Lighthouse. (Tr. at 57.) Her smoking habit remained steady, she said, "no less than 10 [cigarettes a day] and there's days definitely a lot more . . . ." (Tr. at 58.) Concluding, she asserted that her back and neck pain would stop her from standing, bending, and rising during a normal workday, thus preventing her from working. (Tr. at 59.)

Her attorney then took over the questioning, first noting that Plaintiff shifted her chair towards him so that she would not have to turn her neck. (Tr. at 59-60.) She rated the pain at level six out of ten on a VA scale. (Tr. at 60.) During the past week, she twice had to lie down all day, but usually such days occurred only five times per month. (Tr. at 61.) Reaching with her arms, stooping, crouching, kneeling, and crawling would aggravate her neck and back. (Tr. at 61-62.) The pain fatigued her and she took naps daily. (Tr. at 62.) She now also lost focus, struggled to concentrate, and had difficulty deciphering instructions. (Tr. at 63.)

The vocational expert then testified that Plaintiff had acquired transferable skills from her past work, including "keyboarding, phones, and public contact." (Tr. at 67-68.) She could use those skills in positions with a specific vocational preparation ("SVP") level of three, (Tr. at 68), which indicates that Plaintiff could learn the position in one to three months. *See* Dictionary of Occupational Titles ("DOT"), Appendix C, 1991 WL 688702 (4th ed. 1991). In particular, she could work as a general clerk (12,000 positions in southeastern Michigan) or a telephone customer service or telephone solicitor (4400 positions in southeastern Michigan). (Tr. at 68-69.) "Very little" adjustment would be required in the transaction. (Tr. at 69.)

The ALJ then posed a hypothetical to the VE:

Let's assume we have a hypothetical claimant with Ms. Gower's age and education, her past work experience, who has the residual functional capacity to perform the

full range of light exertional work, but with the following additional limitations. This person can occasionally climb stairs, crouch or crawl, kneel or stoop or bend. She needs to avoid climbing ladders, ropes, and scaffolding, and she can only occasionally reach overhead with her upper extremities.

(Tr. at 69-70.) From Plaintiff's list of past positions, the VE responded, the individual could work as a receptionist or press operator, but not an industrial cleaner. (Tr. at 70.) Adding to the hypothetical, the ALJ limited the individual to occasionally moving (flexing, extending, and rotating) her head or neck. (Tr. at 70-71.) The general clerk position remained available, but not the press operation job. (Tr. at 71.) The clerk position also would be available if the individual "needed to avoid workplace hazards, which would be dangerous moving machinery, unprotected heights," and similar environments. (*Id.*)

The VE then explained the stress level of the positions: "[O]ther than the press operator position, these are not production positions, so you're not working . . . in concert with other people. Your work isn't dependent on someone else's and vice versa." (*Id.*) This makes these non-production, self-paced positions less stressful. (Tr. at 72.) The receptionist, general clerk, and telephone solicitor positions would have "minimal changes" and be "fairly consistent on a day-to-day basis." (Tr. at 72-73.) Nonetheless, they were not simple, routine jobs; consequently, limiting the hypothetical individual's concentration to eighty percent of the workday would eliminate them and all other employment. (Tr. at 73.) Frequent, unscheduled breaks would also preclude full-time work. (Tr. at 73-74.) Additionally, the VE stated that the receptionist, general clerk, and telephone solicitor jobs would allow the individual "to periodically stand up, kind of stretch their legs . . . ." (Tr. at 74.) If the VE fully credited Plaintiff's testimony, he added, he would find her unfit for work due to her need for frequent breaks and absenteeism. (Tr. at 75.) An unskilled worker could

occasionally miss two to three days per month, but not every month, and still retain the position. (*Id.*)

Plaintiff's attorney then asked the VE how a "sit/stand option at will" would affect the analysis. (Tr. at 76.) This eliminated the press operator position, but not the others. (*Id.*) If the individual could occasionally reach in front, and never reach overhead, no positions would be available. (Tr. at 77.) An individual could be off task ten percent of the day without losing the job. (*Id.*) Finally, individuals likely could lie down during scheduled breaks, if there was an available space. (*Id.*) The ALJ then clarified that if the individual could frequently reach in front, all positions remained available. (Tr. at 78.)

## F.    Analysis

### 1.    Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she had the residual functional capacity ("RFC") to perform a limited range of sedentary work:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she is limited to occasionally climbing stairs, crouching, crawling, kneeling, stooping, and bending; occasionally reaching overhead with bilateral upper extremities; occasionally flexing/extending/rotating the head and neck. She must avoid workplace hazards, such as moving machinery and unprotected heights and, consistent with this, she is unable to climb ladders, ropes, or scaffolds. Mentally, she is limited to self-paced work.

(Tr. at 21-22.) Sedentary work

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(b), 416.967(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I next consider whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence could justify the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff charges the ALJ's with two errors. First, she asserts a plain substantial evidence argument, noting essentially that the ALJ's entire analysis was undeveloped. (Doc. 13 at 10-12.) Next, she claims that the ALJ's listing discussion was similarly scant. (*Id.* at 12-13.) Plaintiff paints these errors in broad strokes, never adding, for example, what a proper analysis would have looked like or even that the alleged mistakes changed the decision's outcome. In any case, substantial evidence supports the ALJ's decision and I recommend denying Plaintiff's claim.

### a.    Medical Sources and Plaintiff's Credibility

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not

"acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources, including treating opinions not given controlling weight, 20 C.F.R. § 404.1527(c), and the ALJ should almost certainly use the same analysis for "other source" opinions as well. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2. The test looks at whether the source examined the claimant,  "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c).

Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical

evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)). "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data.").

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789 at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ

evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d Cir. 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

22

20 C.F.R. § 404.1529(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

> **b.   Analysis**
>
> *i.   Substantial Evidence*

Plaintiff's first argument lists a series of errors she feels deprives the ALJ's decision of supporting substantial evidence: The ALJ "never states what limitations Ms. Gower suffers from her severe limitations," "never rejects Plaintiff's severe complaints of pain but never does she evaluate it [sic] properly either," "does not include any non-exertional limitation," and "outright misstates and minimizes Plaintiff's impairments." (Doc. 13 at 10-11.) In sum, "The decision is

so lacking in its detail and analysis that it is impossible to understand." (*Id.* at 11.) The theme throughout is Plaintiff's ongoing stupefaction at every turn in the ALJ's decision.

Plaintiff's analysis, however, suffers all the evils it finds in the ALJ's. First, it is inaccurate. The ALJ's RFC does "state[] what limitations Ms. Gower suffers from her severe limitation," which describes exactly what an RFC does. Also, the RFC includes non-exertional limitations: Plaintiff can only occasionally climb stair, crouch, crawl, kneel, stoop, bend, move her head and neck, and must avoid workplace hazards and work in self-paced positions. (Tr. at 21-22.) These are considered non-exertional limitations. 20 C.F.R. §§ 404.1569a(c), 416.969a.

Moreover, Plaintiff's argument makes little effort to show why she is disabled, and instead, in the most general terms, points out the things the ALJ did not do. Plaintiff would have done well to answer the questions her brief naturally provokes: what evidence supports her claim; how would a proper credibility analysis lead the ALJ to find disability; what exactly did the ALJ "mistate[] and minimalize[]"; and how does the ALJ's RFC not state "what limitations Ms. Gower suffers from her severe limitations." By not providing any substantive analysis, the argument flirts with waiver. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that . . . arguments adverted to in only a perfunctory manner, are waived.").

Nonetheless, the ALJ's decision properly analyzed Plaintiff's credibility, canvassed the slim medical evidence, and drew appropriate limitations in the RFC. The ALJ thoroughly addressed Plaintiff's subjective contentions. Discussing whether certain mental disorders were "severe," the ALJ noted the contrast between Plaintiff's complaints and her daily activities. (Tr. at 20.) While the ALJ perhaps made too much of these activities, such as reading or watching television, Plaintiff repeatedly described her relatively rigorous cleaning regimen, which took three hours every other

day. (Tr. at 157, 172.) Next, the ALJ acknowledged Plaintiff's contention that she had trouble completing tasks (Tr. at 175); yet her daily activities suggested otherwise (Tr. at 20), and even as Plaintiff made this contention, she asserted she could finish projects and maintain her attention. (Tr. at 175.) Moreover, the ALJ took note of Dr. Madej's close observations of Plaintiff's normal appearance and demeanor during their session. (Tr. at 20, 261-65.) She also mentioned that Plaintiff's medication helped with the symptoms. (Tr. at 22, 185.)

The ALJ then explicitly reproduced the rules for credibility findings and analyzed Plaintiff accordingly. (Tr. at 22.) She again noted that Plaintiff's daily activities, such as cleaning, shopping, planting flowers, doing laundry, and driving, suggested that she could bend, stand, walk, reach, sit, kneel, lift, and complete tasks. (Tr. at 22.) The ALJ might have also included Plaintiff's admission in the record that she could lift and carry her twenty-two pound grandchild. (Tr. at 253.) The ALJ also pointed out Plaintiff's ambiguous testimony and the many inconsistencies between it and other evidence. (Tr. at 22.) The decision states,

> [W]hen asked about the last time she drove, she said recently but could not specifically recall when. She reported that she does not read much because of blurry vision and pain in her neck, but she reported this as one of her hobbies in the Function Report. She also specifically denied using a computer, but in the record–specifically the Function Report, she noted that she plays computer games. Further, she replied to her representative at the hearing that she needs reminders because she is very forgetful yet, in the Function Report, she said she did not need reminders and was able to handle her own finances. She testified that she has difficulty using her hands, which is why she no longer crochets, yet, she did not indicate this in any manner on her Function Report. These inconsistencies undermine the veracity of her testimony.

(Tr. at 22-23.) This careful parsing of the evidence belies Plaintiff's assertion that the ALJ ignored the credibility analysis. (Doc. 13 at 10-12.)

25

The medical evidence also supports the ALJ. She noted Plaintiff had previous surgery before the current alleged onset date. (Tr. at 23, 252.) As the ALJ observed, "there is very little medical evidence from the period at issue." (Tr. at 23.) The entire medical records span less than one-hundred pages, containing duplicates and many reports prior to the alleged onset date of August 18, 2011. In fact, hardly anything other than the consultative examinations are within the relevant period. A blood test and notes from a visit with Dr. Smith are the only other pieces of evidence. (Tr. at 267, 270.) These show only her subjective complaints that her neck and back hurt. (*Id.*) Prior to the onset date, the only records are a few reports from Dr. Smith, an emergency room report, MRI results, and Dr. Elskens's notes before and after the surgery. Dr. Smith's notes are vague, indicating only that her arm was painful and she had difficulty moving it. (Tr. at 224.) The emergency room MRI's showed "moderate degenerative changes," but nothing significant. (Tr. at 213.) A subsequent MRI, heavily relied upon by Plaintiff in her next argument, demonstrates degenerative disc disease. (Tr. at 227, 281.)

But relying on that lone MRI ignores the subsequent and from all accounts successful surgery two months later. (Tr. at 238, 240.) Even before that procedure, Dr. Elskens, the surgeon, observed that she had only mild restrictions in her neck and head range of motion, and her strength, station, reflexes, and gait were normal. (Tr. at 244-45.) He then performed the surgery, (Tr. at 238, 240), and, one month later, she had "[f]ull, painless range of motion of the neck" and normal strength, station, reflexes, and gait. (Tr. at 238.) Imaging showed proper fusion. (Tr. at 238, 243.) The evidence therefore suggests that her issues, which only caused mild restrictions, were partially resolved by the surgery. Perhaps her back and neck degenerated later, but a handful of cryptic notes from Dr. Smith does not establish enough, if any, backsliding to find her disabled.

26

The ALJ further supported her conclusion with the records from the consultative examinations. (Tr. at 23-24.) Plaintiff told Dr. Banjeri that her pain did not radiate to her legs; he also observed that her back and neck had proper lordosis, her spine was not tender, that she moved normally despite pain, her gait was fine, she could squat and move onto the table, and she walked on tiptoes, heels, and in tandem. (Tr. at 23, 253-55.) The next consultation, with Dr. Montgomery, likewise bolsters the ALJ's findings. (Tr. at 24.) Plaintiff told the examiner there that she had no idea "why they sent me to you. It's nothing to do with my mental state." (Tr. at 261.) Dr. Montgomery agreed, finding nothing wrong with Plaintiff's mental capacity aside from poor insight and judgment. (Tr. at 263.)

Substantial evidence thus supports the ALJ's decision: her credibility analysis was thorough, she reviewed evidence from the relevant period, and she cited supporting medical opinions. Nothing in the record contradicts the analysis or casts doubt on its conclusions.

### ii.    *Listing 1.04*

The ALJ's listing analysis "puzzle[s]" Plaintiff. (Doc. 13 at 12.) She notes, correctly, that the ALJ's discussion of Listing 1.04 is quite cursory. (*Id.*) The ALJ wrote, "The medical evidence does not establish the requisite evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis as required under listing 1.04. Moreover, there is no evidence that the claimant's back disorder has resulted in an inability to ambulate effectively, as defined in 1.00(B)(2)(b)." (Tr. at 21.) Plaintiff contends not that she meets the listing, but that the ALJ's explanation is inadequate because it ignored a pre-onset date MRI and Plaintiff's surgery. (Doc. 13 at 12-13.) Plaintiff leaves it to the Court to scrutinize the MRI under the Listing criteria, or at least determine that there might

27

be something to such scrutiny, prompting a remand. (Doc. 13 at 12-14.) I recommend doing neither, despite the ALJ's slim analysis, and instead suggest upholding the decision.

Claimants with severe impairments that meet or equal a listing in the Appendix are deemed disabled without further analysis. 20 C.F.R. § 404.1520(a)(4)(iii). Fitting a claimant into a listing is dispositive and thus demands a higher level of proof: listed impairments preclude any gainful activity, not just substantial gainful activity. *See Zebley*, 493 U.S. at 525; 20 C.F.R. pt. 404, subpt. P, App. 1. Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c). A claimant must satisfy all of the criteria to meet the listing. *Id. See also Zebley*, 493 U.S. at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). Alternatively, medical equivalence of a Listing can occur in three situations where the claimant fails to meet all of the criteria:

> (1) the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria; (2) the claimant has a non-listed impairment that is at least of equal medical significance" to a listed impairment; or (3) the claimant has a combination of impairments which do not individually meet a Listed Impairment, but are "at least of equal medical significance" to a listing when viewed in totality.

*Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 n.2 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1526).

The ALJ retains discretion at this stage, and does not need to attach "any special significance to the source of a[] [medical] opinion . . . [regarding] whether an impairment meets or equals a listing." 20 C.F.R. § 404.1527(d)(3). This is particularly true for the first part of the analysis: "'[A]n ALJ is capable of reviewing records to determine whether a claimant's ailments *meet* the Listings . . . .'" *Stratton v. Astrue*, 987 F. Supp.2d 135, 148 (D. N.H. 2012) (quoting *Galloway v. Astrue*, No. H-07-01646, 2008 WL 8053508, at *5 (S.D. Tex. May 23, 2008)). The

Commissioner, however, has qualified the ALJ's discretion to decide equivalence, noting that "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." SSR 96-6p, 1996 WL 374180, at *3.

The ALJ's step-three explanation is held to the same standard as the rest of the decision, and the ALJ does not need to "spell[] out every consideration that went into the step three determination" or recount every fact discussed elsewhere in the decision. *Bledsoe v. Barnhart*, 165 F. A'ppx 408, 411 (6th Cir. 2006). The ALJ does not need to use a particular format, and reviewing courts will read the decision "as a whole . . . to ensure there is sufficient development of the record and explanation . . . ." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (noting that the ALJ does not need "to use particular language or adhere to a particular format in conducting his analysis"). The claimant carries the burden of proof at step three and therefore, as the Third Circuit has observed, the ALJ's analysis does not need to be extensive if the claimant fails to produce evidence that she meets the Listing. *Ballardo v. Barnhart*, 68 F. App'x 337, 339 (3d Cir. 2003) (finding that a conclusory, single-sentence analysis was adequate where the claimant "presented essentially no medical evidence of a severe impairment").

In *Retka v. Commissioner of Social Security*, decided before SSR 96-6p was issued, the Sixth Circuit's analysis somewhat opaquely adumbrated *Ballardo*. 70 F.3d 1272, 1995 WL 697215, at *2 (6th Cir. 1995) (unpublished table decision). The Sixth Circuit noted the need for expert opinions on equivalence, but quickly shifted the focus to the "claimant's burden . . . to bring forth evidence to establish that he or she meets or equals a listed impairment." *Id.* The ALJ had

29

scoured the record, found that the plaintiff had produced no evidence supporting disabling pain, and thus the Court rejected the attack on the decision. *Id.* "The absence in the record of medical evidence showing significant neurological deficits and muscle atrophy supports the ALJ's conclusion . . . . [And] [t]hus, there is no merit to the plaintiff's argument that the ALJ erred in failing to find his condition equivalent to the Listing . . . ." *Id.* As the Circuit stated elsewhere, "When a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Social Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004) (citation omitted). Consequently, an ALJ's Listing analysis must be viewed in light of the evidence the claimant presents.

Listing 1.04 can be met in three ways: with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04. Nerve root compression must be accompanied with limited spinal movement, motor and sensory or reflex loss, and positive straight-leg raising tests, both sitting and supine, if the lower back is involved. *Id.* Spinal arachnoiditis must be confirmed by surgery notes, tissue biopsies, or medical imaging. *Id.* Finally, lumbar spinal stenosis is established by imaging studies, "chronic nonradicular pain and weakness," and "inability to ambulate effectively . . . ." *Id.* "Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* § 1.00(B)(2)(b). An individual meets this condition when, for example, they need two crutches or canes, cannot walk without a walker, cannot travel alone, cannot use public transportation, or cannot walk. *Id.*

30

Cases discussing compression vary in their analyses. Some look for concrete proof of actual compression, rather than mere suggestions that a nerve root is affected, to trigger further inquiry or otherwise support the claimant. *See, e.g., Adams v. Comm'r of Soc. Sec.*, No. 13-11132, 2014 WL 897381, at *9 n.5 (E.D. Mich. Mar. 6, 2014) (noting that recent MRI results would not have altered the ALJ's decision on nerve root compression because they "indicate only that a disc protrusion '*abuts* the S1 nerve roots,' not that there is evidence of nerve root *compression*") (adopting Report and Recommendation); *Barnes v. Comm'r of Soc. Sec.*, No. 12-CV-15256, 2013 WL 6328835, at *9 (E.D. Mich. Dec. 5, 2013) ("[Claimant's] x-ray and CT scan show degenerative disc disease and spinal canal stenosis, but there is no mention of nerve root compression in the radiologist's reports."). One court noted that "none of the medical records expressly state that plaintiff suffers from nerve root compression. An implication, based on radiating pain, is not enough to satisfy the Listing [1.04]." *Miller v. Comm'r of Soc. Sec.*, 848 F. Supp. 2d 694, 709 (E.D. Mich. 2011) (adopting Report & Recommendation). Further the plaintiff there did "not point to any positive straight leg raising tests in both the sitting and supine positions. Absent such results, plaintiff cannot meet the listing." *Id.* (citations omitted). Others treat a broader range of descriptions in the treatment notes as representing compression. *See, e.g., Thomas v. Comm'r of Soc. Sec.*, No. 12-14758, 2014 WL 688197, at *6-8 (E.D. Mich. Feb. 21, 2014) (finding that nerve root impingement was equal to nerve root compression).

The Sixth Circuit has addressed the "strict requirements" of this Listing. *Lawson v. Commissioner of Social Security*, 192 F. App'x 521, 529, 530 (6th Cir. 2006). There, the plaintiff's reflexes and range of motion were normal; accordingly she did not meet Listing 1.4A. *Id.* at 529-30. Next, Listing 1.04B required specific medical proof of spinal arachnoiditis, which the plaintiff

31

likewise failed to produce. *Id.* at 530. Finally, the Court rejected the plaintiff's attempt to merge a degenerative disc diagnosis into Listing 1.04. *Id.* 529-30.

> Lawson's counsel attempts to argue that Dr. Ward's diagnosis of 'severe' degenerative disc disease qualifies Lawson for disability benefits, but this bare assertion of severity and a listing of Lawson's claimed symptoms does not satisfy the analysis for disability as set forth in the SSA's regulations . . . in the absence of evidence of specific medical findings consistent with a particular listed impairment.

*Id.* at 530.

Here, Plaintiff does not develop any Listing analysis, instead baldly proclaiming that the MRI evidence showed degenerative back disease. Whatever the merits of equating that disease with Listing 1.04, the MRI predates Plaintiff's surgery. A second, more relevant MRI conducted post-operation displayed proper spinal fusion. (Tr. at 709.)

In any case, the evidence shows she cannot meet the listing, and that the ALJ's analysis was not any shorter than it had to be. There is no significant evidence of nerve root compression. The only mention of it in the record comes from a pre-surgery MRI that showed "[s]ome compression," Dr. Elskens noted. (Tr. at 245.) Even if that sufficed and it somehow escaped the next, post-surgery MRI, Plaintiff did not have muscle atrophy, (Tr. at 254), reflex loss, (Tr. at 245, 254-55), or positive straight-leg raise tests,[2] (Tr. at 253-54). Spinal arachnoiditis can only be proven under the Listing with evidence from surgery notes or biopsies. Neither Dr. Elskens's operation notes (Tr. at 240-41), nor any MRI (Tr. at 227, 238, 240, 243, 245, 281), confirmed arachnoiditis, and Plaintiff never complained of "severe burning or painful sysesthesia . . . ." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04(B). Plaintiff cannot meet Listing 1.04C, lumbar spinal stenosis,

---

[2] Plaintiff's straight leg raises were "90 degrees on both sides with no complaint of pain . . . ." (Tr. at 254.) "A straight leg raise is positive if pain in the sciatic distribution is reproduced between 30 [degrees] and 70 [degrees] . . . ." Cathy Speed, *ABC of Rheumatology: Low Back Pain*, 328 Brit. Med. J. 1119, 1120 (2004).

because it is not evidenced in MRIs, (Tr. at 227, 238, 240, 243, 245, 281), no evidence of pseudoclaudication exists, and, importantly, she is not unable "to ambulate effectively, as defined in [Listing] 1.00B2b." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04(B). Not only was her gait consistently normal, (Tr. at 238, 245), but she also left home alone, (Tr. at 173), shopped, (*id.*), and could walk without a walker even though she claimed to use one at times, (Tr. at 52).

The ALJ's failure to discuss the Listing in depth is not reversible error, if it is error at all. An ALJ does not have to cite to every piece of evidence to show she considered it, *Kornecky*, 167 F. App'x at 508 (quoting *Loral Defense Systems-Akron*, 200 F.3d at 453), or arrange the decision in a particular manner to show she analyzed the evidence. *Jones*, 364 F.3d at 505. The evidence Plaintiff cites came from the pre-onset period and is rendered less probative by the subsequent surgery. Moreover, the ALJ clearly considered the entire record, mentioning the surgery and most other evidence. (Tr. at 23.) She noted Dr. Cole's analysis finding no equivalency, and also Plaintiff's normal gait and the lack of muscle wasting. (*Id.*)

An error in the Listing analysis could of course harm the claimant because a positive finding at that stage is determinative. *Reynolds*, 424 F. App'x at 416. But here Plaintiff's claim is not that the ALJ erred in the analysis, but that she did not conduct one at all. Yet without presenting more evidence, the ALJ did not have to be more thorough. And if she erred by not elaborating, I suggest that it was harmless because the evidence for meeting or equaling the listing is not in the record. *See Berryhill v. Shalala*, 4 F.3d 993, 1993 WL 361792, at *7 (1993) (noting that harmless error applied where the mistake did not affect the procedure or substance of the decision, and where the court was not "'in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture . . . .'" (quoting *Kurzon v.*

33

*United States Postal Serv.*, 539 F.2d 788, 796 (1st Cir. 1976))). Any further discussion would simply expound upon the absence of evidence.

### 3. Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140,(1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  October 30, 2014          /S Patricia T. Morris
                                 Patricia T. Morris
                                 United States Magistrate Judge

## CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date using the Court's CM/ECF system which delivers a copy to all counsel of record.

Date:  October 30, 2014          By    s/Jean L. Broucek
                                 Case Manager to Magistrate Judge Morris

35