UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CAROL GOWER,

Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

_____/

Case No. 13-14511

SENIOR UNITED STATES DISTRICT
JUDGE ARTHUR J. TARNOW

MAGISTRATE JUDGE PATRICIA T.
MORRIS

**ORDER ADOPTING REPORT AND RECOMMENDATION [15]; GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14]; AND DENYING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [13]**

Plaintiff seeks judicial review of an Administrative Law Judge (ALJ)

decision denying her application for disability benefits. Plaintiff filed a Motion for

Summary Judgment [13] on March 3, 2014. Defendant filed a Motion for

Summary Judgment [14] on April 22, 2014. On October 30, 2014, the Magistrate

Judge issued a Report and Recommendation [15] recommending that the Court

grant Defendant's motion and deny Plaintiff's. Plaintiff filed Objections to the

Report and Recommendation [16] on November 9, 2014. Defendant filed a

Response to Plaintiff's Objections [17] on November 11, 2014.

1

For the reasons stated below, the Court **ADOPTS** the Report and Recommendation [15].   Defendant's Motion for Summary Judgment [14] is **GRANTED**.  Plaintiff's Motion for Summary Judgment [13] is **DENIED**.

### FACTUAL BACKGROUND

Plaintiff applied for disability benefits on September 6, 2011, alleging that she became disabled and unable to work on August 18, 2011.  The Magistrate Judge summarized the administrative record of Plaintiff's disability application as follows:

> The medical record is meager, spanning less than one-hundred pages filled with duplicates and barely legible handwritten scrawl. (Tr. at 207-85.) Plaintiff was examined at St. John Hospital by Dr. Laura Fox Smith on September 28, 2010, complaining of left shoulder and arm pain, and also back spasms. (Tr. at 224.) The notes state, without explanation, that she could not lift her arm and Vicodin failed to relieve the pain. (*Id.*) The objective review found heart murmurs and her arm hurt and had limited range of motion. (*Id.*)
>
> Plaintiff went to the emergency room on October 1, 2010, unable to lift her left arm due to shoulder pain. (Tr. at 208.) She rated the pain at level ten out of ten on a visual analog ("VA") scale, and said it had persisted for four days. (Tr. at 210, 212.) She reported a previous, undated back surgery to the examiner. (Tr. at 213.) X-rays showed "moderate degenerative changes" in the lower cervical spine, along with narrowing disc spaces at C5-C6 and C6-C7. (*Id.*)  Cervical spine magnetic resonance imaging ("MRI") was conducted on October 6, 2010. (Tr. at 227, 281.) Dr. Roger Gonda, reviewing the MRI, concluded Plaintiff had degenerative disc disease at multiple levels. (*Id.*) Specifically, there was "mild diffuse disc bulging" at C2-C3; "mild disc bulging" at C3-C4; disc herniation causing moderate flattening and deformity, "severe neural foraminal compromise," and "dorsal displacement of the ventral nerve root sleeve" at C4-C5; disc

2

herniation and spur, and also "bilateral neural foraminal compromise" at C5-C6; and disc herniation and spur, moderate flattening and deformity, and "marked bilateral neural foraminal compromise" at C6-C7. (Tr. at 226, 280.)

Plaintiff saw Dr. Daniel P. Elskens on November 3, 2010, to discuss her cervical spine and shoulder pain. (Tr. at 244.) The pain developed spontaneously two months ago in her lower neck and left shoulder, which were tight and ached, weakening her left arm and reducing her range of motion. (*Id.*) The area also spasmed. (*Id.*) Walking and lifting exacerbated the pain; lying down alleviated it. (*Id.*) The physical assessment found that her head and neck had mild range of motion restriction, normal stability, and normal strength and tone. (Tr. at 245.) Her gait, station, reflexes and posture were normal, and the Romberg test was negative. (*Id.*) An MRI showed moderate kyphotic deformity, degenerative disc disease at C4 through C7, and some compression. (*Id.*) He assessed cervical spondylosis without myelopathy and recommended surgery. (*Id.*)

On November 11, 2010, examination notes state her mobility decreased, her cardiovascular, respiratory, and gastrointestinal systems received an unexplained negative mark, and her skeletal system was abnormal on examination. (Tr. at 223.) The sheet provides no explanation of its findings. Chest x-rays taken the next day revealed no abnormalities. (Tr. at 242, 279.)

At the end of November, Plaintiff underwent an "anterior cervical discectomy, fusion, [and] plating" at the C4 through C7 levels. (Tr. at 238, 240.) Dr. Elskens, the operating surgeon, wrote that her symptoms were "consistent with cervical spondylosis," and an MRI showed kyphosis. (*Id.*) The surgery proceeded without incident. (Tr. at 240-41.) Dr. Elskens examined her one month later, finding that the symptoms diminished: "patient denies neck pain. The patient denies radicular pain. . . . The patient is very satisfied with [the symptoms'] postop course. There is weakness in the left shoulder, [and] the left arm, which is improved." (Tr. at 238.) The physical examination of her head, neck and shoulder girdle showed "[n]o tenderness, crepitation or deformity to palpation. Head and neck in neutral position. Full, painless range of motion of the neck. Normal stability. Normal strength and tone." (*Id.*) Likewise, her gait, station, and posture were normal, and the Romberg test was negative. (*Id.*)

Imaging studies of the operation site displayed proper fusion at all cervical levels. (Tr. at 238, 243.)

Though difficult to decipher, a report from November 12, 2010 shows mixed results. (Tr. at 276.) The examiner circled the "minus" sign, rather than the "plus" symbol, to represent various areas, including Plaintiff's cardiovascular system, respiratory system, and gastrointestinal system; however, her musculoskeletal system was healthy, receiving a "plus." (*Id.*) However, below that section, the examiner marked that her skeletal system was abnormal. (*Id.*) The only other pertinent information gleaned from the sheet is that Plaintiff used tobacco. (*Id.*)

Plaintiff saw Dr. Lal Banerji, a consultative examiner for the state agency, on November 15, 2011. (Tr. at 252.) Her diabetes began in 2002, but the only current symptoms were nocturia and occasional cramps, resolved "within a few seconds" by standing up. (*Id.*) Her cardiovascular system appeared normal, no chest pains or palpitations; but she asserted she had hypertension. (*Id.*) In 1990, Plaintiff developed lower back pain after "a work-related injury," and she had a laminectomy and discectomy in 1997. (*Id.*) Later, "[h]er condition improved to about 50 percent." (*Id.*) She worked throughout this period and quit only recently, in August 2011, due to her neck surgery. (*Id.*) The back problems persisted, she maintained, and she also had pain and swelling in her ankles. (*Id.*) She estimated she could "walk two to three blocks at street level, stand for thirty minutes, . . . climb one flight of stairs[,] . . . sit for two to three hours[,] and lie on the bed for several hours" tossing and turning. (*Id.*) Occasional dizzy spells occurred, she claimed, but she "never had a fall." (*Id.*)

She then explained the issues with her cervical spine, noting her emergency room visit, surgery, and physical therapy. (*Id.*) "The weakness in her left arm improved," she said. (*Id.*) Curiously, the notes state that she did not have neck pain before the surgery, but now did. (*Id.*) Nonetheless, the pain was mild and did not limit her movement. (*Id.*) Her right shoulder pain improved after the surgery, and any lingering pain did not radiate down her arm or limit movement. (*Id.*) She could make a fist and her grip was "good" in both hands: she could button, "tie and untie shoelaces, open doors, write legibly, [and] push and pull." (Tr. at 253.) She knew she could lift twenty-two pounds from the ground and carry it twenty feet "with

2:13-cv-14511-AJT-PTM   Doc # 18   Filed 01/13/15   Pg 5 of 19   Pg ID 402

bearable pain" because "[h]er grandchild weighs that much . . . ." (*Id.*) Her neck and back stiffened periodically. (*Id.*) She used various medication, but "stopped using [a] cervical collar . . . ." (*Id.*) She also "suffer[ed] from mental stress," but had never seen a psychiatrist and her memory was "good." (*Id.*)

Dr. Banerji determined that Plaintiff's neck was supple, she could stand without support, her spine was not tender, her lumbar spine hurt when she moved but was not restricted, her straight leg raises were ninety degrees on both sides without pain, and she had normal cervical and lumbar lordosis. (Tr. at 253-54.) He noted that hip and knee movements were somewhat restricted, but painless. (Tr. at 254, 255.) She walked well, could walk on her toes or heels or in tandem with difficulty, and never complained of pain throughout these tests. (*Id.*) She could squat and rise with lower back pain, and she could stand up from a supine position, get on and off the examination table without help, dress, and undress, and her reflexes were normal. (*Id.*) He concluded her fingers had normal dexterity. (*Id.*) Further, despite subjective complaints, "there [was] no significant physical finding or functional limitations noted during [the] examination" except the pain upon squatting and difficulty with specialized walks. (*Id.*) She could work full time if she avoided climbing ladders and scaffolding, prolonged standing, frequent bending, lifting heavy weights, and squatting. (*Id.*)

Plaintiff completed a report on September 25, 2011 describing her daily activities, capacities, and impairments.(Tr. at 170.) Her husband filled out a similar report a few days earlier, mirroring Plaintiff's conclusions. (Tr. at 155.) Plaintiff said she passed the typical day doing light house work, playing computer games, crocheting, and watching television. (Tr. at 170.) Personal care was not a problem, except reaching her head proved difficult if her neck or arm hurt. (Tr. At 171.) Cooking everyday, she sometimes made large meals with help, (Tr. at 172), although her husband implied that her pain prevented finishing complete meals. (Tr. at 157.) Around the house, she wrote, "I do cleaning," which she revised in the margin to read, "I do *light* cleaning." (Tr. At 172.) Included in light cleaning was vacuuming every other day for a half hour to forty-five minutes and doing laundry, "sometimes all day," once per week. (*Id.*) Her husband estimated that she put in three hours of cleaning every other

5

day. (Tr. at 157.) She also planted flowers. (Tr. At 157.) But she did all of this only when she felt able, "if I start to hurt I stop then [sic] go back to it." (*Id.*) Her husband and sister took over many chores. (Tr. at 162.)

She could drive and leave her house without help; she shopped for food and clothing in stores and online. (Tr. at 173.) Managing financial affairs did not present problems, and she asserted being capable of paying bills, counting change, handling her savings account, and using a checkbook. (*Id.*) Friends visited occasionally, and she chatted with them on the phone everyday. (Tr. at 174.) Her pain circumscribed her social activities, but dinners, theater, and visits were possible, she said, "as long as we don't sit to[o] long . . . ." (Tr. at 175.) She asserted limitations in nearly every physical category, except the use of her hands, but only found one mental difficulty, completing tasks. (Tr. at 175.) Nonetheless, she finished projects she started and could maintain her attention unless she was "in pain." (*Id.*)

She also completed a "Pain Questionnaire." (Tr. at 185.) Her neck began hurting in September 2010, her back in 1997. (*Id.*) The pain extended to her arm and sometimes gave her headaches. (*Id.*) Asked how often the pain occurred, she stated, it "all depends on what I [am] doing," but once started it could last for days. (*Id.*) Her medicines provided "some" relief, kicking in anywhere from one-half hour to one hour after taking them. (*Id.*)

On December 19, 2011, Dr. Patricia Madej, a consultative examiner, met with Plaintiff to discuss her mental health. (Tr. at 261-65.) At the start of the session Plaintiff launched into her list of physical impairments. (Tr. at 261.) Told it was a mental health evaluation, she said,

> "I don't know why they sent me to you. It's nothing to do with my mental state. (?) When you're used to working all your life it's very hard when you can't do it anymore. I do get depressed because of my life. I get breakdowns all the time. I passed out a few times. I don't know why. I just go out. My husband's veen [sic] very sick. I don't know. I guess it gets overwhelming at times.... I'm not mentally ill or anything [. . . ] only stress. Just stress."

(*Id.*) Unsurprisingly, she had no "history of inpatient or outpatient psychiatric treatment." (*Id.*) The report then traces a series of her

responses to different aspects of daily functioning. (Tr. at 262.) Her social life seemed to brim with friends and family: "I love people. I have lots of friends. I don't see them that often. . . . [but] [t]hey call me all the time to see how I'm doing." (*Id.*) Her interests and hobbies were more limited but included crocheting, cooking, shopping, watching television, and "'having the grandkids over.'" (*Id.*) She also pitched in on chores, such as cleaning and laundry. (*Id.*)

Dr. Madej found Plaintiff's physical appearance and behavior unremarkable, noting merely that Plaintiff complained of constant neck pain and periodically stretched her neck. (*Id.*) Her motor activity appeared normal as well and though Plaintiff complained that her pain made it so she "'can't just sit,'" Dr. Madej observed that she "sat throughout the interview . . . . " (Tr. at 263.) Moving to the mental assessment, Dr. Madej determined that Plaintiff's "contact with reality was good," her speech and thought "were well organized and goal directed," her affect was euthymic, and she had appropriate mental orientation, but her insight and judgment were poor. (*Id.*) She was "significantly focused on the symptoms of her pain," and said her mood was "'pissed off.'" (*Id.*) Dr. Madej concluded that Plaintiff was bereaving multiple losses–her physical abilities, employment, and her recently deceased sister–and reported a "Fair" prognosis. (Tr. at 264.) She also assigned a Global Assessment of Functioning score of sixty to sixty-three. (*Id.*) This score indicates either (1) "[s]ome mild symptoms. . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships," or (2) "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning . . . ." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000).

On the same day as Dr. Madej's consultation, Dr. James P. Cole reviewed the record evidence for the state agency. (Tr. at 93.) Of note, he considered Listing 1.04 before concluding that Plaintiff was not disabled. (Tr. at 90, 94.) This demonstrates that he believed Plaintiff neither met nor equaled the listing.

A blood test on April 13, 2012, showed that Plaintiff had vitamin D deficiency. (Tr. at 270.) Plaintiff was examined the same day by Dr. Smith. (Tr. at 267.) The notes indicate Plaintiff's stress level had risen, she suffered insomnia, and her neck and back hurt.

(*Id.*) All of the examination notes, including the skeletal portion, were unchanged. (*Id.*)

At the administrative hearing on December 5, 2012, Plaintiff testified that she lived with her husband, son, and two grandchildren. (Tr. at 35.) At her first job, in a steel company, she "drove a sweeper and actually had to clean . . . up underneath the machines . . . ." (Tr. at 38.) She worked in other positions at the factory as well, generally lifting one to ten pounds, though as the ALJ pointed out, her work history report listed ten to twenty pounds. (Tr. at 39.) Plaintiff confirmed it was the former range. (*Id.*) Her employment ended when the factory closed. (Tr. At 44.) At Lighthouse, her next job, she wrote files and used the computer, frequently lifting less than ten pounds. (Tr. at 42.) She quit working because of her pain, which produced headaches and disrupted her sleep: "I loved the job . . . but I just couldn't do it anymore. I was going in late. It was causing some issues, you know, with not getting there on time because I just couldn't sleep at night." (Tr. at 43-44.)

Plaintiff said she did not know how often she drove each week, stating she got in the car to go to the store and doctors, and to pick up her grandchildren from school. (Tr. at 46-47.) On a typical day, after a fitful night's sleep, she rose early to wake her grandchildren. (Tr. at 48.) Then she would sit, followed by cleaning, followed by more sitting, and sometimes again cleaning, which could take her the entire day. (*Id.*) She did not often cook, read, or use the computer. (Tr. at 49-50.) Her shopping trips were limited to "get[ting] what we really need to have," she said, "and that's about it." (Tr. at 50.) She had not crocheted for a year, she added. (Tr. at 51.)

Her neck bothered her more than her back. (Tr. at 52.) Standing in one position hurt her back, and she mentioned vaguely using a walker with a seat, which she obtained last summer, if she anticipated needing to sit. (Tr. at 52.) Bending would cause shooting pains in her neck. (*Id.*) Shorter walks were not difficult, but walking around the grocery store while shopping was. (Tr. at 53-54.) Sitting was sometimes tricky, but it helped that she could lie down, move, stand, or walk when she was home. (Tr. at 54.) Dr. Smith provided pain medication and other prescriptions for her mental health issues. (Tr. at 55–56.) She added that her diabetes perhaps explained her blurred vision and her dizziness while working at Lighthouse. (Tr. at 57.) Her

smoking habit remained steady, she said, "no less than 10 [cigarettes a day] and there's days definitely a lot more . . . ." (Tr. at 58.) Concluding, she asserted that her back and neck pain would stop her from standing, bending, and rising during a normal workday, thus preventing her from working. (Tr. at 59.)

Her attorney then took over the questioning, first noting that Plaintiff shifted her chair towards him so that she would not have to turn her neck. (Tr. at 59-60.) She rated the pain at level six out of ten on a VA scale. (Tr. at 60.) During the past week, she twice had to lie down all day, but usually such days occurred only five times per month. (Tr. at 61.) Reaching with her arms, stooping, crouching, kneeling, and crawling would aggravate her neck and back. (Tr. at 61-62.) The pain fatigued her and she took naps daily. (Tr. at 62.) She now also lost focus, struggled to concentrate, and had difficulty deciphering instructions. (Tr. at 63.)

The vocational expert then testified that Plaintiff had acquired transferable skills from her past work, including "keyboarding, phones, and public contact." (Tr. at 67-68.) She could use those skills in positions with a specific vocational preparation ("SVP") level of three, (Tr. at 68), which indicates that Plaintiff could learn the position in one to three months. *See* Dictionary of Occupational Titles ("DOT"), Appendix C, 1991 WL 688702 (4th ed. 1991). In particular, she could work as a general clerk (12,000 positions in southeastern Michigan) or a telephone customer service or telephone solicitor (4400 positions in southeastern Michigan). (Tr. at 68-69.) "Very little" adjustment would be required in the transaction. (Tr. at 69.)

The ALJ then posed a hypothetical to the VE:

Let's assume we have a hypothetical claimant with Ms. Gower's age and education, her past work experience, who has the residual functional capacity to perform the full range of light exertional work, but with the following additional limitations. This person can occasionally climb stairs, crouch or crawl, kneel or stoop or bend. She needs to avoid climbing ladders, ropes, and scaffolding, and she can only occasionally reach overhead with her upper extremities.

(Tr. at 69-70.) From Plaintiff's list of past positions, the VE responded, the individual could work as a receptionist or press

9

operator, but not an industrial cleaner. (Tr. at 70.) Adding to the hypothetical, the ALJ limited the individual to occasionally moving (flexing, extending, and rotating) her head or neck. (Tr. at 70-71.) The general clerk position remained available, but not the press operation job. (Tr. at 71.) The clerk position also would be available if the individual "needed to avoid workplace hazards, which would be dangerous moving machinery, unprotected heights," and similar environments. (*Id.*)

The VE then explained the stress level of the positions: "[O]ther than the press operator position, these are not production positions, so you're not working . . . in concert with other people. Your work isn't dependent on someone else's and vice versa." (*Id.*) This makes these nonproduction, self-paced positions less stressful. (Tr. at 72.) The receptionist, general clerk, and telephone solicitor positions would have "minimal changes" and be "fairly consistent on a day-today basis." (Tr. at 72-73.) Nonetheless, they were not simple, routine jobs; consequently, limiting the hypothetical individual's concentration to eighty percent of the workday would eliminate them and all other employment. (Tr. at 73.) Frequent, unscheduled breaks would also preclude full-time work. (Tr. at 73-74.) Additionally, the VE stated that the receptionist, general clerk, and telephone solicitor jobs would allow the individual "to periodically stand up, kind of stretch their legs . . . ." (Tr. at 74.) If the VE fully credited Plaintiff's testimony, he added, he would find her unfit for work due to her need for frequent breaks and absenteeism. (Tr. at 75.) An unskilled worker could occasionally miss two to three days per month, but not every month, and still retain the position. (*Id.*)

Plaintiff's attorney then asked the VE how a "sit/stand option at will" would affect the analysis. (Tr. at 76.) This eliminated the press operator position, but not the others. (*Id.*) If the individual could occasionally reach in front, and never reach overhead, no positions would be available. (Tr. at 77.) An individual could be off task ten percent of the day without losing the job. (*Id.*) Finally, individuals likely could lie down during scheduled breaks, if there was an available space. (*Id.*) The ALJ then clarified that if the individual could frequently reach in front, all positions remained available. (Tr. at 78.)

10

On January 17, 2013, the ALJ denied Plaintiff's application for disability benefits, finding her not disabled.  The Appeals Council denied Plaintiff's request for review on August 29, 2013.  On October 28, 2013, Plaintiff filed the instant suit for judicial review of the ALJ's decision.

## STANDARD OF REVIEW

The Court reviews objections to a Magistrate Judge's Report and Recommendation (R&R) on a dispositive motion *de novo*.  *See* 28 U.S.C. §636(b)(1)(c).

Judicial review of a decision by an ALJ  is limited to determining whether the factual findings are supported by substantial evidence and whether the ALJ employed the proper legal standards.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The ALJ's factual findings "are conclusive if supported by substantial evidence."  *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 243 (6th Cir. 1987).  "Substantial evidence is defined as more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  The substantial evidence standard "does not permit a selective reading of the record," as the reviewing court's assessment of the evidence supporting the ALJ's findings "must take into account whatever in the

11

record fairly detracts from its weight." *McLean v. Comm'r of Soc. Sec.*, 360 F. Supp. 2d 864, 869 (E.D. Mich. 2005) (quoting *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir. 1984)).  However, so long as the ALJ's conclusion is supported by substantial evidence, a court must "defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

**ANALYSIS**

Plaintiff raises two objections to the Report and Recommendation [15].  First, Plaintiff argues that the ALJ's assessment of her residual functional capacity (RFC) was not supported by substantial evidence, and that the Magistrate Judge erroneously found otherwise.  Second, Plaintiff argues that the Magistrate Judge improperly condoned the ALJ's inadequate explanation of her findings at "Step Three" of the disability analysis.  The Court overrules both objections.

## I.    Objection One: The ALJ's RFC Finding Was Not Supported by Substantial Evidence

Plaintiff's first objection is difficult to parse.  Plaintiff appears to object to the Magistrate Judge's conclusion that the ALJ's RFC finding (based in part on the ALJ's evaluation of Plaintiff's credibility) was supported by substantial evidence.  Specifically, Plaintiff suggests that the Magistrate Judge improperly concluded that

12

the ALJ's "lack of reasoning" in support of the RFC was "automatically justified" by Plaintiff's alleged daily activities.

The Magistrate Judge did not rely on Plaintiff's daily activities to the extent Plaintiff suggests. Indeed, the Magistrate Judge noted that the ALJ "perhaps made too much of these activities, such as reading or watching television." The Magistrate Judge concluded, however, that the ALJ had identified sufficient *other* evidence to support the RFC finding. For instance, the Magistrate Judge noted that the ALJ considered Plaintiff's medication and Dr. Madej's observation of Plaintiff's appearance and demeanor. The Magistrate Judge further acknowledged that the ALJ questioned Plaintiff's credibility in part because her testimony was inconsistent with her representations in the Function Report. Finally, the Magistrate Judge recognized that the ALJ considered records from the consultative examinations.

In sum, the Magistrate Judge concluded that substantial evidence supported the ALJ's finding because "her credibility analysis was thorough, she reviewed evidence from the relevant period, and she cited supporting medical opinions." There is no factual basis to Plaintiff's suggestion that the Magistrate Judge affirmed the ALJ's conclusion solely, or even primarily, on the basis of Plaintiff's

daily activities. Plaintiff has identified no other reason to disturb the Magistrate Judge's conclusion that substantial evidence supports the ALJ's RFC finding.[1]

## II.    Objection Two: The ALJ's Step Three Analysis Violated Plaintiff's Due Process Rights

Plaintiff argues the Magistrate Judge should have found that the ALJ violated her due process rights by failing to adequately explain, at "Step Three" of the disability analysis, why her impairments do not meet or medically equal Listing 1.04. At Step Three of the disability analysis, an ALJ evaluates whether a claimant's impairments meet or medically equal in severity any impairment listed in Appendix 1 of 20 C.F.R. pt. 404, subpt. P. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004) (citing 20 C.F.R. § 404.1520(a)(4)(iii)). If the claimant shows equivalence, she is deemed disabled. *Id.* Listing 1.04 refers to disorders of the spine and can be met in three ways. *Lawson v. Comm'r of Soc. Sec.*, 192 Fed. App'x 521, 529 (6th Cir. Aug. 22, 2006) (unpublished). First,

---

[1] Plaintiff asserts, in a cursory manner, that the medical records "are replete with diagnostic testing, surgeries, and pain reports that were never analyzed by the ALJ nor considered by the Magistrate Judge." Plaintiff does not direct the Court's attention to any of these allegedly overlooked items of medical evidence. The Magistrate Judge warned Plaintiff that she had risked waiving her arguments by failing to identify evidence supporting her disability claim "and instead, in the most general terms, point[ing] out the things the ALJ did not do." Rather than heed this warning and identify supporting evidence, Plaintiff has merely reiterated her claim that such evidence has been overlooked. The Court deems this argument waived.

14

"Listing 1.04A refers to evidence of nerve root compression characterized by specific clinical findings … and requires a finding of limitation of motion of the spine and loss of motor reflex."  *Id.*  Second, "Listing 1.04B refers to spinal arachnoiditis, confirmed by an operative note or tissue biopsy …."  *Id.*  Finally, "Listing 1.04C refers to lumbar spinal stenosis that results in certain findings on diagnostic imaging techniques and certain specified physical limitations … [including] a finding that the claimant cannot ambulate effectively."  *Id.* at 529-30.

Here, the ALJ devoted a section of her written opinion to Step Three, in which she concluded that Plaintiff's impairments do not meet or medically equal any Listing.  The ALJ addressed Listing 1.04 as follows:

> The medical evidence does not establish the requisite evidence of nerve root compression, spinal arachnoidits or lumbar spinal stenosis as required under listing 1.04.  Moreover, there is no evidence that the claimant's back disorder has resulted in an inability to ambulate effectively, as defined in 1.00(B)(2)(b).

The ALJ did not discuss any specific items of evidence within the Step Three section of her opinion.

The Magistrate Judge acknowledged that "the ALJ's discussion of Listing 1.04 is quite cursory."  However, the Magistrate Judge concluded that the ALJ's cursory Step Three discussion did not require remand.  The Magistrate Judge reasoned that the ALJ committed no error, since other sections of the ALJ's

opinion demonstrated sufficient consideration of Step Three evidence: "[T]he ALJ clearly considered the entire record, mentioning the surgery and most other evidence.  She noted Dr. Cole's analysis finding no [Listing 1.04] equivalency, and also Plaintiff's normal gait and the lack of muscle wasting."  In the alternative, the Magistrate Judge reasoned that even if the ALJ erred, the error was harmless because Plaintiff's evidence does not support a finding that her impairments meet or medically equal Listing 1.04.

Plaintiff does not engage with the Magistrate Judge's analysis in her Objections, instead merely reiterating that the ALJ's failure to articulate a Step Three analysis requires remand.  Plaintiff implicitly relies on two critiques of the Magistrate Judge's reasoning.  First, by asserting that the ALJ "did not spell out *any* consideration [of evidence] for the step three determination," Plaintiff implies that it was improper for the Magistrate Judge to look beyond the section of the ALJ's opinion devoted to Step Three and to rely on the ALJ's discussion of relevant evidence in other sections.  Second, by simply ignoring the Magistrate Judge's conclusion that the alleged error was harmless, Plaintiff implies that harmless error analysis is inapplicable to this type of error.

The Court agrees with the Magistrate Judge's conclusion that the ALJ's cursory *discussion* of Listing 1.04 does not require remand, since the ALJ's

opinion as a whole demonstrates sufficient consideration of the relevant evidence. For instance, when discussing the support for her RFC finding, the ALJ noted Dr. Banerji's findings that Plaintiff showed no reflex loss, limitation of spinal movement, or muscle atrophy around the joints; that her straight-leg tests were negative; and that she could ambulate fairly well unassisted. The ALJ also stated that she gave great weight to the opinion of Dr. Cole. Dr. Cole opined that Plaintiff was not disabled, despite indicating that he considered Listing 1.04.

Plaintiff has not explained why this discussion of the evidence would be insufficient to support the ALJ's Step Three finding if the ALJ had merely copied and pasted it under her Step Three heading or otherwise explicitly linked it to the Step Three finding. Plaintiff merely implies that such explicit links are necessary. Authority in this district, however, suggests otherwise. *See Bukowski v. Comm'r of Soc. Sec.*, No. 13-cv-12040, 2014 WL 4823861, at *3 (E.D. Mich. Sept. 26, 2014) (Michelson, J.) ("That the ALJ performed some of [the Step Three] analysis in a different section of his opinion does not render his Step–Three findings inadequate.") (citing *Bledsoe v. Barnhart,* 165 Fed. App'x 408, 411 (6th Cir. 2006) (holding Step Three finding sufficient where the ALJ described evidence regarding impairments earlier in the opinion, "even though he did not spell out every fact a second time under the step three analysis")); *Wright ex rel. A.B.W. v.*

*Comm'r of Soc. Sec.*, No. 12-13564, 2013 WL 3879802, at *8 (E.D. Mich. July 26, 2013) (Cook, J.) (holding a Step Three finding supported by substantial evidence where the ALJ reviewed supporting medical evidence "in the pages both preceding and following [the Step Three] conclusion") (citing *Bledsoe*, 165 Fed. Appx. at 411); *M.G. v. Comm'r of Soc. Sec.*, 861 F. Supp. 2d 846, 859 n.6 (E.D. Mich. 2012) (Goldsmith, J.) ("[I]n some cases, factual findings elsewhere in the narrative may suffice as factual findings at Step Three.") (citing *Bledsoe*, 165 Fed. App'x at 411).

In sum, Plaintiff has not convinced the Court that a bright line rule requires remand whenever an ALJ fails to explicitly identify which evidence discussed in her opinion underlies her Step Three findings. Though such failure likely warrants remand in some circumstances, Plaintiff's objection all but ignores the particular facts of this case—including those facts the Magistrate Judge found to weigh against remand. The Court therefore overrules the objection.

### CONCLUSION

For the reasons stated above,

**IT IS ORDERED** that the Report and Recommendation [15] is **ADOPTED** as the findings and conclusions of the Court.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment [14] is **GRANTED**.  Plaintiff's Motion for Summary Judgment [13] is **DENIED**.

**SO ORDERED**.


s/Arthur J. Tarnow
Arthur J. Tarnow

Dated:  January 13, 2015                    Senior United States District Judge